# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

KEVIN ROBERT SMITH,

Defendant-Appellant.

UNPUBLISHED
August 14, 2018

No. 334692
Ingham Circuit Court
LC No. 15-001023-FC

Before: CAMERON, P.J., and METER and BORRELLO, JJ.

BORRELLO, J. (*dissenting*).

Review of this matter has led me to conclude that the primary purpose for introduction of the majority of the testimony offered by Detective Harrison and Dr. Guertin was for the improper purpose of vouching for the credibility of the victims in this matter. Additionally, I find that failure by trial counsel to object to the numerous hearsay statements of Harrison and Guertin, coupled with counsel's failure to object to the majority of their improper vouching constituted ineffective assistance of counsel and denied defendant a fair trial. Accordingly, I respectfully dissent from the majority's analysis and their legal conclusions. I would reverse defendant's convictions and grant defendant a new trial.

## I. *SHAW* IS RETROACTIVE

In this case, defendant's trial occurred over the course of eight days from May 31 to June 17, 2016. This Court's decision in *Shaw* was issued on June 14, 2016. Regarding the application of *Shaw* in the instant matter, the majority asserts that because the *Shaw* opinion was issued during trial, "it would be difficult to hold counsel responsible for failing to object on the basis of *Shaw*" and "it did not fall below an objective standard of reasonableness for counsel to fail to object on the basis of *Shaw*." However, in *Shaw*, this Court did not announce a "new rule" by holding that the defendant was denied the effective assistance of counsel based on his trial counsel's failure to object to inadmissible hearsay testimony that amounted to improper bolstering of the complainant's credibility, and there is accordingly no question that this holding has complete retroactive effect to matters, such as the instant one, still pending on direct appellate review. Rather, this Court's decision in *Shaw* involved the issue whether the defendant was denied his right to the effective assistance of counsel, guaranteed by both the United States and Michigan Constitutions. *Shaw*, 315 Mich App 668, 671-672; 892 NW2d 15 (2016); US Const, Am VI; Const 1963, art 1, § 20. When a right protected by the United States Constitution

-1-

is at issue, federal retroactivity rules are implicated. *Harper v Virginia Dep't of Taxation*, 509 US 86, 89, 100; 113 S Ct 2510; 125 L Ed 2d 74 (1993) (explaining that the federal retroactivity doctrine controls over state-law retroactivity principles with respect to matters of federal law). However, principles of retroactivity set forth by the Michigan Supreme Court are also implicated in this instance. "A state may accord broader effect to a new rule of criminal procedure than federal retroactivity jurisprudence accords." *People v Maxson*, 482 Mich 385, 392; 759 NW2d 817 (2008), citing *Danforth v Minnesota*, 552 US 264, 287-288; 128 S Ct 1029; 169 L Ed 2d 859 (2008). Moreover, *Shaw* is a decision by this Court that also involved application of purely state-law principles such as the Michigan Rules of Evidence, 315 Mich App at 672-674, and the retroactivity of judicial decisions interpreting Michigan law is determined under Michigan's own state-specific retroactivity standards. "A state in defining the limits of adherence to precedent may make a choice for itself between the principle of forward operation and that of relation backward. . . . The choice for any state may be determined by the juristic philosophy of the judges of her courts, their conceptions of law, its origin and nature." *Great Northern R Co v Sunburst Oil & Refining Co*, 287 US 358, 364-365; 53 S Ct 145; 77 L Ed 360 (1932); see also *Harper*, 509 US at 100 (acknowledging the "freedom state courts . . . enjoy to limit the retroactive operation of their own interpretations of state law"); *People v Barnes*, ___ Mich ___, ___; ___ NW 2d ___ (2018) (stating that both federal and state rules govern in the retroactivity context). Accordingly, principles of both federal and state law are relevant to resolving the issue whether *Shaw* is retroactive.

Under federal law, the United States Supreme Court has recognized the long-standing general rule that judicial decisions have retroactive effect. *Harper*, 509 US at 94. More specifically with respect to rights protected by the United States Constitution in the criminal context, the United States Supreme Court has held "that a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past." *Griffith v Kentucky*, 479 US 314, 316, 328; 107 S Ct 708; 93 L Ed 2d 649 (1987). Under Michigan law, "[t]he general rule is that judicial decisions are to be given complete retroactive effect." *People v Doyle*, 451 Mich 93, 104; 545 NW2d 627 (1996) (quotation marks and citation omitted), cert den sub nom *Doyle v Michigan*, 519 US 873; 117 S Ct 192; 136 L Ed 2d 129 (1996). The Michigan Supreme Court has stated that retroactive application of a judicial decision is "problematic" if the decision is " 'unexpected' and 'indefensible' " in light of existing law. *Id*. (citation omitted). "Complete prospective application has generally been limited to decisions which overrule clear and uncontradicted case law." *Id*. (quotation marks, citation, and bracket omitted); accord *People v Shami*, 501 Mich 243, 257 n 34; 912 NW2d 526 (2018). To determine the retroactivity of a new rule announced in a judicial decision, our Supreme Court employs a three-part test that considers "(1) the purpose of the new rule[]; (2) the general reliance on the old rule, and (3) the effect of retroactive application of the new rule on the administration of justice." *People v Sexton*, 458 Mich 43, 60-61; 580 NW2d 404 (1998), reh den 459 Mich 1203 (1998); cert den sub nom *Young v Michigan*, 525 US 1126; 119 S Ct 912; 142 L Ed 2d 909 (1999), reh den 526 US 1095; 119 S Ct 1514; 143 L Ed 2d 665 (1999).

However, our Supreme Court first considers the threshold question whether a holding in a judicial decision constitutes a "new" rule before it applies the three-part retroactivity test: "Before any question of the retroactive application of an appellate decision arises, it must be clear that the decision announces *a new principle of law*." *People v Phillips*, 416 Mich 63, 68;

330 NW2d 366 (1982) (emphasis added). "A rule of law is *new* for purposes of resolving the question of its retroactive application . . . either when an established precedent is overruled or when an issue of first impression is decided which was not adumbrated by any earlier appellate decision." *Id*. If the holding in a judicial decision is merely the product of applying existing statutory authority and established precedent to the facts of the case, then that holding does not constitute the resolution of an issue of first impression that was not clearly foreshadowed. *Id*. at 73, 75. The holding of a judicial decision has retroactive effect if that holding did not announce a *new rule*. *Doyle*, 451 Mich at 95, 101, 103-104, 113; *Phillips*, 416 Mich at 65-66, 75. "If a rule of law announced in an opinion is held to operate retroactively, it applies to all cases still open on direct review." *W A Foote Mem Hosp v Michigan Assigned Claims Plan*, 321 Mich App 159, 176; 909 NW2d 38 (2017).

In *Shaw*, this Court held that the defendant, who had been convicted of nine counts of first-degree criminal sexual (CSC-I) conduct and acquitted of one additional count of CSC-I, received ineffective assistance of counsel based on his trial counsel's failure to object to multiple hearsay statements that essentially bolstered the complainant's credibility and that came in at trial through the testimony of the complainant's family members, the police detective who conducted a forensic interview of the complainant, and the doctor who conducted a medical examination of the complainant. 315 Mich App at 671-674, 676-678. The hearsay statements recounted the complainant's out-of-court descriptions of the sexual abuse allegedly committed by the defendant. *Id*. at 673-674, 676.

In reaching the conclusion that the failure to object to these statements constituted deficient performance that prejudiced the defendant such that defendant was denied his right to the effective assistance of counsel, the *Shaw* Court applied Michigan Rules of Evidence related to hearsay, *id*. at 672-674, citing MRE 801, MRE 802, and MRE 803(4), as well as the rule that " '[i]n a trial where the evidence essentially presents a one-on-one credibility contest between the victim and the defendant, hearsay evidence may tip the scales against the defendant, which means that the error is more harmful,' " *Shaw*, 315 Mich App at 673, quoting *People v Gursky*, 486 Mich 596, 620-621; 786 NW2d 579 (2010). Furthermore, the *Shaw* Court was concerned about how the testimony of the detective and the doctor amounted to bolstering the credibility of the complainant in a case where the complainant's credibility was of central importance. *Shaw*, 315 Mich App at 674, 676-678. However, the *Shaw* Court did not actually cite any specific legal authority for the proposition that a witness may not vouch for the credibility of another witness; the *Shaw* Court merely assumed this principle. *Id*.

With respect to the detective, the *Shaw* Court noted that she testified about the complainant's statements and further testified "extensively" about how she was able to "confirm[] numerous background facts that the complainant reported to her," how she was able to "confirm the veracity" of statements made by the complainant, and how she was able to corroborate the complainant's statements before charges were filed. *Id*. at 676. The *Shaw* Court reasoned that the detective effectively "concluded that the complainant was credible and so advised the jury." *Id*. With respect to the doctor who examined the complainant, the *Shaw* Court noted that the doctor "recounted in detail the complainant's statements to him about the abuse," testified that he believed the complainant's allegations on the basis of her medical history, and testified that he "believed that his physical findings were consistent with someone who had suffered child sexual abuse." *Id*. at 674, 678. The *Shaw* Court concluded that the defendant's

trial counsel performed deficiently by failing to object to the inadmissible hearsay testimony of the detective and the doctor because there was no reasonable basis to conclude that it would be strategically advantageous to permit highly damaging hearsay testimony in order to point out minor factual inconsistencies in the complainant's statements. *Id*. at 675-677, 677 n 3. Finally, the *Shaw* Court concluded that there was a reasonable probability that outcome of the trial would have been different had the defendant's trial counsel objected to this testimony because the complainant's version of events was repeatedly presented to the jury and was done so by the detective and the doctor who essentially gave the complainant's story "an official stamp of approval" and bolstered her credibility. *Id*. at 677-678.

These conclusions were the result of applying pertinent Michigan Rules of Evidence and established precedent involving issues of hearsay, improper vouching for the credibility of another, and ineffective assistance of counsel. Although the *Shaw* Court did not provide a citation for the principle that a witness may not vouch for the credibility of another witness, this rule is nonetheless well established. Our Supreme Court has made clear that "it is improper for a witness or an expert to comment or provide an opinion on the credibility of another person while testifying at trial" because "[s]uch comments have no probative value" and "do nothing to assist the jury in assessing witness credibility in its fact-finding mission and in determining the ultimate issue of guilt or innocence." *People v Musser*, 494 Mich 337, 349; 835 NW2d 319 (2013) (quotation marks and citation omitted). Moreover, "child-sexual-abuse cases present special considerations given the reliability problems created by children's suggestibility." *Id*. at 357 (quotation marks and citation omitted). And our Supreme Court has "condemned opinions related to the truthfulness of alleged child-sexual-abuse complainants," specifically noting that "in cases hinging on credibility assessments, . . . the jury is often 'looking to "hang its hat" on the testimony of witnesses it views as impartial.' " *Id*. (citation omitted).

Because the *Shaw* Court merely applied established law to the facts of the case in reaching the conclusions discussed above, its holding related to those issues has retroactive effect under the federal retroactivity standard. *Griffith*, 479 US at 324 & n 10. For the same reason, its holding did not constitute the resolution of an issue of first impression that was not clearly foreshadowed under the Michigan retroactivity standard. *Phillips*, 416 Mich at 68. The above conclusions reached by the *Shaw* Court also did not involve the overruling of established precedent. Accordingly, a new rule was not announced, and this holding of *Shaw* has retroactive effect under state law as well. *Doyle*, 451 Mich at 95, 101, 103-104, 113; *Phillips*, 416 Mich at 68.

Further, the fact that *Shaw* was decided during the course of defendant's trial does not negate the applicability of *Shaw* to this Court's resolution of the instant case. It was already well established that a witness cannot vouch for the credibility of another witness. *Musser*, 494 Mich at 349. While defense counsel may not have been able to specifically cite *Shaw* in objecting to testimony that occurred during defendant's trial before the decision in *Shaw* was issued, defense counsel certainly could have objected to testimony that constituted improper vouching for the credibility of other witnesses. Thus, the issue is really whether defense counsel was constitutionally ineffective by failing to object to the testimony of Harrison and Guertin on the ground of improper vouching, not whether he was ineffective by failing to object on the ground of "*Shaw*."

## II. IMPROPER VOUCHING

There can be little doubt that it is difficult to show that a conviction must be reversed based on a claim of ineffective assistance of counsel. In order to prevail on appeal, a defendant must demonstrate (1) that counsel's performance was deficient and (2) that the defense was prejudiced by counsel's deficient performance. *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d (1984), reh den 467 US 1267; 104 S Ct 3562; 82 L Ed 2d 864 (1984); *Riley*, 468 Mich at 140. Satisfying the first prong requires a defendant to show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 US at 688; *Riley*, 468 Mich at 140. Satisfying the second prong requires a defendant to show that but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different. *Strickland*, 466 US at 694; see also *People v Trakhtenberg*, 493 Mich 38, 55-56; 826 NW2d 136 (2012). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 US at 694.

A defendant making an ineffective assistance of counsel claim "must overcome the strong presumption that counsel's performance was born from a sound trial strategy." *Trakhtenberg*, 493 Mich at 52. However, "a court cannot insulate the review of counsel's performance by calling it trial strategy." *Id*. Trial strategy "in fact must be sound, and counsel's decisions as to it objectively reasonable." *People v Douglas*, 496 Mich 557, 585; 852 NW2d 587 (2014). When reviewing an ineffective assistance claim, "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged," and "[i]n every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Strickland*, 466 US at 696.

In this case, the primary concern to address regarding the testimony of Harrison is whether she impermissibly vouched for the credibility of the two alleged victims and their mother, and, whether she was able to do so without objection.

"It is '[t]he Anglo–Saxon tradition of criminal justice . . . [that] makes jurors the judges of the credibility of testimony offered by witnesses.' " *Musser*, 494 Mich at 348-349 (citation omitted). Because the task of judging the credibility of witnesses' testimony is one that is reserved for the jury, "it is improper for a witness or an expert to comment or provide an opinion on the credibility of another person while testifying at trial." *Musser*, 494 Mich at 349. This concept is well established in Michigan jurisprudence. See, e.g., *People v Buckey*, 424 Mich 1, 17; 378 NW2d 432 (1985) (noting the general rule that it is "improper for a witness to comment or provide an opinion on the credibility of another witness since matters of credibility are to be determined by the trier of fact"); *People v Row*, 135 Mich 505, 507; 98 NW 13 (1904) (concluding that that the trial court erroneously allowed a witness to testify to being satisfied that the alleged victim of a sexual assault told the testifying witness "the truth" about what the defendant had done); *People v Parks*, 57 Mich App 738, 750; 226 NW2d 710 (1975) (noting "the settled and long-established rule that a witness cannot express an opinion concerning the guilt or innocence of a defendant"). Our Supreme Court has explained that a witness's testimony commenting on the credibility of another individual has "no probative value because they do nothing to assist the jury in assessing witness credibility in its fact-finding mission and in determining the ultimate issue of guilt or innocence." *Musser*, 494 Mich at 349 (quotation marks

and citations omitted). Consequently, such testimony is "considered 'superfluous' and . . . 'inadmissible lay witness [ ] opinion on the believability of a [witness's] story' because the jury is 'in just as good a position to evaluate the [witness's] testimony.' " *Id*. (citation omitted; brackets in original).

In *Musser*, our Supreme Court held that under the facts of that particular case, "the trial court abused its discretion by failing to redact the majority of the detectives' out-of-court statements commenting on [the] credibility [of the complainant and child victims generally] from the recording [of the defendant's police interrogation] that was played to the jury because [the detectives' statements] were irrelevant to their offered purpose of actually providing context to defendant's statements." *Musser*, 494 Mich at 339, 343, 351, 365-366. The *Musser* Court further held that these errors undermined the reliability of the verdict, and it vacated the defendant's convictions for second-degree criminal sexual conduct and assault and battery that had arisen out of allegations made by an eleven-year-old girl. *Id*. at 339, 366.

In *People v Peterson*, 450 Mich 349, 352; 537 NW2d 857 (1995), our Supreme Court clarified "the proper scope of expert testimony in childhood sexual abuse cases." The *Peterson* Court held that an expert witness (1) "may not testify that the sexual abuse occurred," (2) "may not vouch for the veracity of a victim," and (3) "may not testify whether the defendant is guilty." *Id*. at 352.[1] However, the *Peterson* Court further held that an expert witness may properly testify "regarding typical and relevant symptoms of child sexual abuse for the sole purpose of explaining a victim's specific behavior that might be incorrectly construed by the jury as inconsistent with that of an actual abuse victim and that an expert may also testify "with regard to the consistencies between the behavior of the particular victim and other victims of child sexual abuse to rebut an attack on the victim's credibility." *Id*. at 352-353. Notably, although the *Peterson* Court phrased its holding broadly in terms what was permissible and impermissible for an "expert" to testify about, the *Peterson* Court only specifically analyzed the use of expert testimony about common behaviors in child-sexual-abuse victims; the Court loosely referred to this type of evidence as "syndrome" evidence. *Id*. at 362, 369-371, 373-375.

In *Douglas*, 496 Mich at 561, 566, our Supreme Court concluded that the defendant, who had been convicted of first-degree and second-degree criminal sexual conduct based on the alleged abuse of his then-three-year-old daughter, was entitled to a new trial on the ground that he had received ineffective assistance of counsel due to his trial counsel's failure to object to the testimony of witnesses that constituted improper vouching for the credibility of the alleged victim. At the defendant's trial, a detective sergeant testified to the content of a conversation between the alleged victim's mother and the defendant in which the alleged victim's mother recounted the allegation made by the alleged victim and told the defendant, "I know my daughter don't lie; why is she making these allegations then." *Id*. 561, 563, 568. Additionally, the forensic interviewer who interviewed the alleged victim was qualified as an expert and testified, as pertinent to the instant case, about the content of the interview and that she "considered

---

[1] In reaching this holding, the *Peterson* Court explained that it was reaffirming its holding from *People v Beckley*, 434 Mich 691; 456 NW2d 391 (1990).

whether there had been a misunderstanding, but determined there was not because [the alleged victim] was 'very clear' about what happened." *Id*. at 563, 569. The forensic interviewer further opined that the alleged victim had not been coached and that she believed that the alleged victim " 'was being truthful with [her]' during the interview." *Id*. at 570 (brackets in original). Finally, a CPS worker testified that she had filed a petition to initiate child-protective proceedings after interviewing the alleged victim's mother and observing the forensic interview. *Id*. The CPS worker further testified that she would not seek such a petition if she believed that a child was lying or if she had not substantiated that the alleged conduct had occurred. *Id*. The CPS worker also testified that she substantiated the alleged victim's allegations through her own investigation and that there was no indication in the forensic interview disclosures that the alleged victim had been coached or untruthful. *Id*. The defendant's trial counsel did not object to any of this testimony on the ground of improper vouching. *Id*. at 569, 570.

In addressing the defendant's claim of ineffective assistance of counsel, the *Douglas* Court determined that the testimony of the CPS worker regarding her conclusions that the allegations had been substantiated and that the alleged victim had not been coached or untruthful "violated the well-established principle that 'it is improper for a witness or an expert to comment or provide an opinion on the credibility of another person while testifying at trial.' " *Id*. at 583, quoting *Musser*, 494 Mich at 349. The *Douglas* Court further determined that the forensic interviewer's testimony also violated this prohibition on vouching when she offered her expert opinions that the alleged victim was being truthful and had not been coached. *Douglas*, 496 Mich at 583. The Court also determined that the detective sergeant's testimony about the statement of the alleged victim's mother constituted improper vouching. *Id*. at 584, 586.

The *Douglas* Court concluded that the defendant's trial counsel performed below an objective standard of reasonableness by allowing the above testimony to come in at trial without objecting. *Id*. at 585-586.[2] Noting that counsel's trial strategy must be actually "sound" and carried out through objectively reasonable decisions, as well as the rule that " 'a court cannot insulate the review of counsel's performance by calling it trial strategy,' " the *Douglas* Court reasoned that there was "no sound strategy in counsel's failure to object to the vouching testimony." *Id*. (citation omitted).

The *Douglas* Court further concluded that there was a reasonable probability that the outcome of the defendant's trial would have been different but for the deficient performance of the defendant's trial counsel. *Id*. at 586. The Court reasoned as follows:

> As already discussed, the prosecution's case hinged wholly on the credibility of [the alleged victim's] allegations, making defense counsel's success in undermining that credibility all the more critical. Rather than pursuing this

---

[2] Similar to the record in this case, the *Douglas* Court did note that the defendant's trial counsel had initially made a successful challenge to the prosecution's "attempt to elicit an expert conclusion from [the forensic interviewer] regarding the veracity of [the alleged victim's] statements" but then "inexplicably permitted that testimony without objection." *Douglas*, 496 Mich at 570, 585.

strategy vigilantly, defense counsel permitted . . . three figures of apparent authority and impartiality, with direct involvement in and knowledge of the investigation leading to the defendant's prosecution—to present testimony improperly reaching the key factual issue before the jury: whether [the alleged victim] was telling the truth. [The forensic interviewer's and CPS worker's] commentary was especially prejudicial in this regard—the former offering the jury an expert opinion regarding [the alleged victim's] credibility in the instant case, and the latter offering the jury her, and CPS's, professional assessment of the veracity and substantiation of [the alleged victim's] complaints. We cannot overlook the influence such testimony may have in a case such as this. See *Musser*, 494 Mich at 357-358 (noting that, "given 'the reliability problems created by children's suggestibility,' " this Court "has condemned opinions related to the truthfulness of alleged child-sexual-abuse complainants" because the jury in such credibility contests "is often 'looking to "hang its hat" on the testimony of witnesses it views as impartial' "), quoting *Peterson*, 450 Mich at 371, 376. Given the centrality of [the alleged victim's] credibility to the prosecution's case, the lack of evidence beyond her allegations, and the nature of the testimony offered by [the forensic interviewer, CPS worker, and detective sergeant], we believe it reasonably probable that, but for this testimony, the outcome of the defendant's trial may have been different. See *Musser*, 494 Mich at 363–364. [*Douglas*, 496 Mich at 586-588.]

The *Douglas* Court granted the defendant a new trial on the basis of his ineffective assistance of counsel claim.[3]

Furthermore, as previously discussed, this Court held in *Shaw*, 315 Mich App at 672-674, 676-678, that the defendant received ineffective assistance of counsel based on his trial counsel's failure to object to multiple hearsay statements that essentially bolstered the complainant's credibility and that were introduced at trial through the testimony of the complainant's family members, the police detective who conducted a forensic interview of the complainant, and the doctor who conducted a medical examination of the complainant.[4] The hearsay statements recounted the complainant's out-of-court descriptions of the sexual abuse allegedly committed by the defendant. *Id*. at 673-674, 676. The *Shaw* Court was also concerned about how the testimony of the detective and the doctor amounted to bolstering the credibility of the complainant in a case where the complainant's credibility was of central importance. *Shaw*, 315 Mich App at 674, 676-678.

---

[3] The *Douglas* Court also concluded that the trial court had committed independent reversible error by admitting certain out-of-court statements by the alleged victim about the abuse, which were made during her forensic interview, to be admitted. *Douglas*, 496 Mich at 566. But the Court explained that the "trial court's error and defense counsel's deficient performance were *each* sufficiently prejudicial to require a new trial." *Id*. (emphasis added).

[4] Notably, Guertin was also the doctor involved in *Shaw*. 315 Mich App at 673.

As previously discussed, the *Shaw* Court noted with respect to the detective that she testified about the complainant's statements and further testified "extensively" about how she was able to "confirm[] numerous background facts that the complainant reported to her," how she was able to "confirm the veracity" of statements made by the complainant, and how she was able to corroborate the complainant's statements before charges were filed. *Id*. at 676. The *Shaw* Court reasoned that the detective effectively "concluded that the complainant was credible and so advised the jury." *Id*. With respect to the doctor who examined the complainant, the *Shaw* Court noted that the doctor "recounted in detail the complainant's statements to him about the abuse," testified that he believed the complainant's allegations on the basis of her medical history, and testified that he "believed that his physical findings were consistent with someone who had suffered child sexual abuse." *Id*. at 674, 678. The *Shaw* Court concluded that the defendant's trial counsel performed deficiently by failing to object to the inadmissible hearsay testimony of the detective and the doctor because there was no reasonable basis to conclude that it would be strategically advantageous to permit highly damaging hearsay testimony in order to point out minor factual inconsistencies in the complainant's statements. *Id*. at 675-677, 677 n 3. Finally, the *Shaw* Court concluded that there was a reasonable probability that outcome of the trial would have been different had the defendant's trial counsel objected to this testimony because the complainant's version of events was repeatedly presented to the jury and was done so by the detective and the doctor who essentially gave the complainant's story "an official stamp of approval" and bolstered her credibility. *Id*. at 677-678.

First, in defining the type of testimony that constitutes impermissible vouching testimony, it is clear that a witness cannot explicitly testify that another witness was truthful or was lying. *Douglas*, 496 Mich at 583-584; *Musser*, 494 Mich at 349; *Buckey*, 424 Mich at 17; *Row*, 135 Mich at 507. However, determining whether testimony is vouching in nature is not limited to whether a witness used certain magic words related to truth, lying, credibility, or the like. The *Douglas* Court, in concluding that the CPS worker impermissibly vouched for the alleged victim's credibility, specifically referred to the fact that the CPS worker had testified that her investigation had led her to find that the alleged victim's allegations were substantiated. *Douglas*, 496 Mich at 583. Furthermore, this Court reasoned in *Shaw* that the detective essentially informed the jury that she had determined that the complainant was credible because the detective testified about how, through her investigation, she "confirmed numerous background facts" reported to her by the complainant and confirmed the veracity of various statements by the complainant before filing charges. *Shaw*, 315 Mich App at 676.

Assessing the credibility of witnesses is a task that is firmly within the province of the jury; accordingly, is no probative value in permitting a witness to testify about the credibility of another witness because such testimony does not aid the jury in its task of judging credibility and "the jury is 'in just as good a position to evaluate' " the believability of a witness's story. *Musser*, 494 Mich at 348-349 (citation omitted). In other words, "[w]here a jury is as capable as anyone else of reaching a conclusion based on certain facts, it is error to permit a witness to reason from those facts to a conclusion," and "[b]y allowing such testimony, the province of the jury [is] invaded." *People v Walker*, 40 Mich App 142, 143-145; 198 NW2d 449 (1972) (concluding that where there was conflicting evidence about whether the gun that fired the fatal shot was held at the time of the shooting by individual positioned near the defendant and an eyewitness had testified about the respective positions of the defendant and the other individual at the time of the shooting, the trial court erred by permitting the prosecutor to elicit testimony

-9-

from the eyewitness "regarding which individual could have fired the fatal shot given the point at which the fatal bullet entered decedent's body"). This rationale was explained as follows by our Supreme Court more than a century and a half ago:

> It is also an elementary rule that, where the court or jury can make their own deductions, they shall not be made by those testifying. In all cases, therefore, where it is possible to inform the jury fully enough to enable them to dispense with the opinions or deductions of witnesses from things noticed by themselves, or described by others, such opinions or deductions should not usually be received. [*Evans v People*, 12 Mich 27, 34 (1863).]

Thus, the rule that can appropriately be derived is that is improper credibility vouching to allow a witness to testify about how he or she personally confirmed various elements of another witness's story or about why another witness's story is plausible or logical. Such testimony essentially connects the dots for the jury from evidence to conclusion via one witness's explanation of *how* another witness's testimony has been corroborated and, by extension, and the witness's veracity confirmed. This kind of vouching testimony, rather than simply asserting that another individual told the truth, instead functions as an attempt to get the jury to substitute the witness's reasoning or personal investigation for the jury's own evaluation of another witness's credibility.

## III. TESTIMONY OF DETECTIVE HARRISON

Applying the above legal principles to Harrison's testimony, Harrison improperly vouched for the credibility of DG and KG. As previously stated, Harrison conducted forensic interviews of both DG and KG during the course of investigating the allegations in this case, and she was called as a witness by the prosecution. During her direct examination, Harrison testified extensively about the nature of the forensic interview process and Michigan's forensic interviewing protocol, as well as her specialized training for investigating child sexual abuse cases and conducting forensic interviews. More specifically, she testified that Michigan's forensic interviewing protocol was developed "to assist us in the best techniques for interviewing children"; that she primarily investigates cases of child sexual abuse; and that in these cases, her "job is to thoroughly investigate and determine if it should or shouldn't be forwarded to the Prosecutor's office for review." The prosecutor also questioned Harrison on direct examination as follows:

> *Q*. I want to talk to you a little bit about forensic interviewing. Could you please tell the jury what is forensic interviewing? How does it differ from a normal interview?
>
> *A*. The goal for a forensic interview is to obtain a statement from a child in an unbiased developmentally appropriate neutral way, to assist in criminal justice and child welfare systems. What that really means, the word "forensic" is research-based or scientific. The State of Michigan developed the protocol based on research to help us as every day professionals on the do's and don'ts of how to interview a child, what the best practice is.

Harrison testified that she used the forensic interview protocol in her interviews of DG and KG in this case, although they were 18 years old at the time. Harrison also indicated that the initial phase of the forensic interview includes obtaining "a promise to tell the truth" from the interviewee. Additionally, Harrison explained that in a forensic interview, "we develop alternate hypotheses to look at different possibilities," that the alternate hypotheses are tested through questioning in the interview, and that "[i]t's a fact-gathering mission to look at all the possibilities, minimize suggestibility." Harrison stated, "There can't be any misunderstandings," and "[w]e need to make sure that we are getting the allegations correct, that we're looking to see what other possibilities are." According to Harrison, two alternate hypotheses were developed: (1) that there was a misunderstanding regarding whether there was actually a sexual touch and (2) that one of the involved parties was lying or that only one of the twins was abused. Harrison tested these hypotheses in her interviews of DG and KG. When the prosecutor asked Harrison if she was "able to eliminate any of the hypotheses or come to any conclusions," defense counsel objected "to any conclusions" on the ground that the prosecutor was "essentially asking her to determine what the truth was of what their allegations are." The prosecutor withdrew the question. However, shortly thereafter, Harrison testified that during the interview, she "look[s] for details of the act that would determine whether this is a sexual or non-sexual touch or whether it was a misunderstanding. The prosecutor followed up by questioning Harrison as follows without objection from defense counsel:

Q. At the end of your interview, is your investigation complete if you eliminated certain alternate hypotheses, is that the end of your investigation?

A. No.

Q. All right. So are you able to eliminate alternate hypotheses, or any of the hypotheses during your actual interview process? Were you able to, in this particular case?

A. Well, I mean, my job is to gather the facts. So I, during the forensic interviews of both K[G] and D[G]—let's see how to answer that. There are times in which there is a misunderstanding. So then the case ends at that point.

After the forensic interview, the allegation, itself, which had been reported to me, was that [defendant] had sexually abused K[G] and D[G] [], that was still standing at the end of the interview. So I continued the investigation.

Q. You weren't concluding at the end that they had been abused, but rather that's where your investigation is now targeted?

A. Correct.

Q. Were you able to address the alternate hypotheses [sic] that it was a misunderstanding?

A. Yes.

Q. How did you do that?

-11-

*A.* Well, they were clear—so I asked questions and they provided clear statements to me. So it's not a misunderstanding at that point.

*Q.* All right. And how about the allegation that one was abused and not the other?

*A.* They both provided clear disclosures.

*Q.* At that point you were left with that it actually happened or that it was a lie, correct?

*A.* Correct.

*Q.* You are not able at that point to eliminate the lie?

*A.* Well, a portion of it. So part of that could be, does the reporting source[5] have a motivation, or is the reporting source lying. And so I develop questions during the interview as who is the first person that you told. So if they told somebody prior to the reporting source, then that helps me with that.

Defense counsel did not object to the above testimony or otherwise renew his previous objection. Harrison also testified that she needed to go the scene of the incidents described in a forensic interview "to see if that is possible" and to see "the viewpoint of witnesses" in order to "put [herself] in that situation to then get additional leads or information that [she] can follow up and gather those facts to bring." Harrison would take photographs while at a given location. Although not specifically referenced by defendant in his appellate argument, Harrison also offered the following testimony during her direct examination, to which there was no objection and in which she essentially explained to the jury why she thought the description given by DG and her mother of the incident where defendant allegedly grabbed DG's chest made sense:

*Q.* Again, we are using this photograph, just kind of a way as an example. But this photograph, in and of itself, does it provide for you and your investigation any corroboration of what you were told?

*A.* Yes. I need to understand if what's being reported to me is possible. That's why, even if a crime had occurred decades prior, I always make it as a rule to go back to visit that scene, whether it's changed or evolved or not, whether the furniture is the same or different, or the walls are even different. I still need to go to document it to see what I find to see where the facts lead.

---

[5] In this case, it appears that DG's mother would have been the "reporting source": Harrison testified that when she began working on this case, her "first contact had been with [the mother]" who had contacted law enforcement and whose "twin daughters had disclosed after their high school open house that they had been sexually abused for several years by their cousin, [defendant]."

*Q.* In this particular photograph, did it help you to understand ultimately how someone could be sitting on the couch and having another person in the room?

*A.* Yes.

*Q.* How so?

*A.* The positioning of the furniture, of how, you know, the one chair is a little bit more forward. And then also the description of sitting close together. And when you see, you know, how couch cushions are divided. And then also the opportunity for the reflection. [The mother] had been reporting seeing a reflection. And as an investigator I didn't really understand that at that point.

*Q.* So looking at People's 52, taking that photograph, did that help you understand what she meant better?

*A.* I think what I see there is that reflections are possible. Again, at that point, I didn't know where the windows were in the home, or if reflections were possible in the home. So I still wasn't certain did she see the reflection in that TV or a different one, or a piece of glass or a different one. But I see that reflection is possible.

*Q.* Thank you. So we just kind of did that as an exercise. Is that a good, a fair depiction of how you kind of run an investigation? You take the facts as you understand them, and then look for corroboration evidence, one way or the other?

*A.* Correct.

During Harrison's cross-examination, defense counsel questioned Harrison as follows:

*Q.* Now, you have talked about there is instances where there is a delayed disclosure. Does delayed disclosure equate in any way with being a credible disclosure?

*A.* I can't—

*Q.* I guess the question I'm asking, because the disclosure is delayed, does that somehow make it, at least in your experience, more credible?

*A.* I see cases—my job is to investigate and report the facts. But I see cases in both delayed and immediate disclosure. In both delayed and immediate disclosure, sometimes I screen them out. And in both delayed and immediate disclosure, sometimes I've turned them over to the Prosecutor's office.

Defense counsel also attempted to elicit inconsistencies between DG's and KG's forensic interview statements and their trial testimony by asking Harrison. For example, defense counsel questioned Harrison as follows:

-13-

*Q*. How was it that K[G] made it clear to you how the pencil was used in this case?[6]

*A*. When I said a clear statement, my alternate hypotheses [sic] was that this could have been a misunderstanding or a non-sexual touch. There was no doubt in my mind that she was describing sexual touch at the end of the interview. So that was what I meant by that.

And then every detail, there is not an expectation to make every detail absolutely clear. That's not always possible.

*Q*. But you would acknowledge that any—that there was no clarity with regard to D[G]'s statement to you—I'm sorry—K[G]'s statement to you about how, where, what, why, a pencil was used on her, was there?

*A*. I disagree with what you're saying. I mean, we had a discussion. I asked questions about objects. She stated objects to me. I do think that that's clear.

On redirect, the prosecutor elicited further testimony, without objection from defense counsel that allowed Harrison to explain how her investigation corroborated DG's allegations:

*Q*. [Defense counsel] asked you about who you interviewed concerning the hot tub incident that we're talking about. And I believe your answer was, obviously, D[G], initially. And then you interviewed the Grandma and Grandpa [], Johnny [], Senior and D[G] correct?

*A*. Yes.

*Q*. What information did they provide that either—that helped you out with understanding D[G] and what she told you that had happened? And let me just, if I can, just jump to as the swimsuits.

*A*. Yes.

*Q*. So what did D[G] tell you about swimsuits in the hot tub?

*A*. She said that most of the time there isn't swimsuits in the hot tub. I could be wrong on most of the time. She said that the kids did not wear swimsuits

---

[6] During KG's cross-examination, defense counsel had asked KG about portions of the description of the Allen wrench incident that KG gave during her forensic interview in which KG had stated that defendant was "look[ing] for something else, like pencils or just other things" but had not described defendant actually touching her with a pencil.

in the hot tub. So I wanted to speak to an adult about that or another source to see if that is what the other source was telling me.

*Q*. What did you find out?

*A*. That they agreed with that statement.

*Q*. What about shirts, where to get shirts?

*A*. I asked the same question of Grandma [], where are shirts kept. He [sic] showed me the closet which, when I was there, was consistent with what information had been provided to me by D[G].[7]

*Q*. What about the fact that there had been a waterbed? What, if anything, about the waterbed in that room?

*A*. In Grandma and Grandpa G[]'s bedroom?

*Q*. Yep.

*A*. Yes. So when I was there, the furniture had changed. But she was able to describe to me what furniture had been like prior, you know, 13 years prior.

*Q*. And that was consistent, correct?

*A*. Yes.

*Q*. Why is that important in your investigation on sexual abuse cases?

*A*. For more than one reason. Again, it's to understand the scene to help create a picture of was this possible. It also is to test alternate hypotheses to see— look for consistency in witness statements.

*Q*. All right. The thing about the pond incident, near the dock, do you recall that incident with D[G]?

*A*. Yes.

*Q*. What did you do—these are ways to corroborate statements, fair to say?

*A*. Yes.

---

[7] It appears that the second reference to DG was intended to refer to the alleged victim in this case. DG and her grandmother have the same name.

*Q.* What did you do to corroborate the statement about the pond incident, if anything?

*A.* It was mainly looking to see where the pond was, which house was the pond at, how close was the pond or far to the house. Where are seating areas. What does the dock look like. Basically observing, based on she had talked about the proximities of the dock, the heighth [sic] of the dock. I wanted to go there and document what the dock looked like.

*Q.* Okay. What about people's observations about the two of them in the pond at other times?

*A.* Right. There was more than one witness statement about hollering out to them or seeing them at a distance. And I wanted to be able to put myself in that position of where those people would be, and then how far is that to holler out, or how far is that to what could they see, what would be their vantage point.

Harrison specifically explained how, in her view, a photograph of the scene where defendant allegedly grabbed DG's chest demonstrated that the reflection reported by DG's mother was "possible." In essence, Harrison testified regarding her interpretation of the evidence and advocated that a particular conclusion be drawn by the jury—namely, that the story told by DG and her mother made sense and was believable—even though the jury was just as capable of evaluating whether the photograph supported the veracity of DG's and her mother's respective testimony. By asking the jury to allow her own reasoning to replace that of the jury's in this regard, Harrison was improperly vouching for the credibility of DG and her mother. *Musser*, 494 Mich at 348-349; *Evans*, 12 Mich at 34; *Walker*, 40 Mich App at 144-145.

Furthermore, Harrison testified that the initial phase of a forensic interview includes obtaining a "promise to tell the truth" from the interview and that the interview was "a fact-gathering mission." She explained that she tested the alternate hypotheses (1) that the allegations involved a misunderstanding regarding whether there was a sexual touch and (2) that the allegations involved a lie. Harrison stated that she concluded that there was no misunderstanding because the victims "provided clear statements," and she also indicated that she was partially able to eliminate the notion that lying was involved. Harrison also heavily emphasized that the forensic interview process as "unbiased," "research-based," "scientific," and "neutral." This testimony served as clear vouching for the veracity of the victims' statements through painting the forensic interview process as a rigorous truth-testing tool on which the jury could rely to conclude that the victims' statements were believable. Harrison also invited the jury to rely on the quality of her investigation by testifying about how she corroborated the girls' statements through comparing them with the statements of other individuals she interviewed and noting the consistencies; Harrison expressly explained that her job was to "thoroughly investigate" cases to determine whether referral to the prosecutor's office was warranted. By so testifying, Harrison presented the forensic interview process and her own investigation as substitutes for the necessity of the jury to independently make its own credibility determinations, and she therefore improperly vouched for the credibility of both victims. *Musser*, 494 Mich at 348-349; *Evans*, 12 Mich at 34; *Walker*, 40 Mich App at 144-145. In short, under the guise of ill-described "scientific methods" she held herself out to the jury as a human lie-detector.

Moreover, although the prosecution argues that these statements were not hearsay because they were offered to show their effect on Harrison's investigation rather than for the truth of the matter asserted, the statements were still inadmissible because they were effectively part of Harrison's improper vouching testimony and were accordingly not offered for any relevant purpose. As our Supreme Court has explained, "even if an out-of-court statement is not offered for the truth of the matter asserted, the statement is not automatically admissible because the 'touchstone' of admissibility is 'relevance.' " *Musser*, 494 Mich at 354 (citations omitted).

To the extent that defense counsel's cross-examination of Harrison and defense counsel's trial strategy of generally attempting to undermine the credibility of prosecution witnesses could be understood to have made the steps of Harrison's investigation somehow relevant (which is what the prosecution appears to argue on appeal) the prosecutor at trial should have only elicited testimony from Harrison that would show that she followed proper investigative procedures without eliciting testimony that took the additional step of explaining how her investigative findings demonstrated that the stories of other witnesses were believable. It is that additional step of essentially connecting the dots for the jury that constituted the improper vouching by Harrison.

Returning to defendant's ineffective assistance of counsel claim, defense counsel in this case failed to object to Harrison's improper vouching testimony set forth above. "[C]redibility contests are not uncommon in criminal sexual conduct cases," *People v Anderson*, 446 Mich 392, 407 n 37; 521 NW2d 538 (1994), cert den sub nom *Michigan v Anderson*, 513 US 1183; 115 S Ct 1175; 130 L Ed 2d 1128 (1995), and "the principle issue in cases involving criminal sexual conduct is the credibility of the complainant," *People v Beckley*, 434 Mich 691, 717 n 39; 456 NW2d 391 (1990) (opinion by BRICKLEY, J.). And while the instant case did not involve a credibility "contest" in the strict sense of the phrase because defendant did not testify, the credibility of the alleged victims and other prosecution witnesses was clearly of central importance in this case. Yet, despite the importance of witnesses' credibility and defense counsel's apparent strategy of trying to undermine the victim's credibility, defense counsel still did not challenge the clearly inadmissible vouching testimony by Harrison set forth above. Our Supreme Court has long recognized "the undue weight that jurors may be inclined to place on police officers' statements." *Musser*, 494 Mich at 363. In this case, there was no "sound" strategic reason for defense counsel's failure to object to Harrison's pervasive vouching, and defense counsel's performance thus fell below an objective standard of reasonableness. *Douglas*, 496 Mich at 585-586.[8]

---

[8] Defense counsel did object, on the ground of improper vouching, to the prosecutor's question asking Harrison whether it is typical for a victim to "disclose everything that happened to them in that initial interview." In making his objection, defense counsel stated that this question was asking Harrison to "give an opinion as to credibility." The prosecutor argued that the question was actually "based on her training and experience doing interviews," and the trial court stated that "[i]n essence, he is asking as she did this, what did you do." Defense counsel responded to the trial court's statement by saying, "I don't have a problem with that. If he can restrict that, I won't have an objection." The trial court then overruled defense counsel's objection. However,

## IV. TESTIMONY OF GUERTIN

Dr. Guertin, a specialist in general pediatrics, pediatric critical care, and child abuse, testified as an expert in "child abuse."[9]  Guertin conducted examinations of both victims.  In response to the prosecutor's question about why it was still important to examine an individual when the alleged abuse did not occur recently, Guertin responded that "[i]t's what it always is, which is diagnosis and treatment."  He explained that sexual assault or physical abuse can be diagnosed "years afterwards"; that it is important "to make sure that the perpetrator still doesn't have access to the child, even if she was a teenager"; that it is important to make sure that counseling is being provided,[10] and that there were still potential sexually transmitted infection issues.

Guertin examined DG first.  He testified that he took a medical history from her, during which she told him "that starting at an early age, sometime around five years or so, up through about age 15 or 16, that she had been raped and molested by a cousin," who she identified as defendant.  According to Guertin, DG told him that the incidents occurred at her grandmother's home, that her mother had witnessed one incident of inappropriate touching, and that the other incidents were not seen by anyone else.  Guertin's testimony also included recounting more specific allegations made by DG during the course of the medical history, including that defendant had done "a lot of rough fingering [and] touching" inside of DG's "private area," that defendant had put "the plastic part of a wrench that had been gnawed on or chewed on by a dog" inside her private area, that defendant had engaged in "genital to genital contact" with DG when she was five years old, that there was an incident in a pond at her grandparents' home where DG "had to manipulate [defendant's] penis" under the water, that defendant used pornography with DG "while he was molesting her," and that defendant told DG that her family would be ruined or destroyed if she told anybody.  Guertin also testified that he performed a physical examination of DG and that she had "two deep notches in her hymen."  DG also informed Guertin that she was sexually active at the time of the examination.

According to Guertin, the potential for injury to the hymen is "higher in the pre-pubertal period" because the hymen is fragile and does not stretch at that stage of a child's development, and "the opening of the hymen in a pre-pubertal child, a child up through about age 10 to 12," is approximately 10.5 millimeters, which is smaller than the size of the average finger, erect adult penis, or the presumed size of a wrench handle.  However, Guertin further explained that a sexually active individual "can certainly have evidence of sexual trauma from normal or volitional sexual activity[] [a]nd depending on how active they are, the incidence of that can be pretty high."

defense counsel permitted the other impermissible vouching testimony described above to come in without any objection.

[9] The prosecutor moved to qualify Guertin as an expert "in the field of sexual abuse against children," and defense counsel indicated that he had no objection."  The trial court then stated that it was qualifying Guertin as an expert "in child abuse."

[10] Notably, Guertin clarified that "we don't provide the psychological counselling."

Guertin testified that in his opinion, DG:

gave a very clear history of being sexually molested over a period of years, beginning at a very early age, age 5, by a person named [defendant]. It included fondling, inserting the handle of a tool into her vagina, which was both painful and caused bleeding. She also integrated [sic] that there was at least some degree of penetration with his penis. On one occasion she was very young, age five. And she indicated that she was compelled to manipulate his penis as well. She was warned that discovery of this would ruin her family. And, also, he used pornography at least during some of these acts.

The physical examination showed two deep notches. One almost a transection, which clearly could support—which clearly supports an allegation of sexual abuse. As well, she was sexually active. And that you cannot necessarily separate out the findings that you see from abuse versus that volitional sexual activity. That's it.

Regarding KG's medical history, Guertin testified as follows in response to the prosecutor's questions:

*Q.* What was the history of K[G]?

*A.* Oh. She knew that she had come to the office to get a pelvic exam, because she had been molested. Actually she said a pelvic exam for being molested as a child. So I asked her: Well, were you or not. And her answer was: Yes. I asked if it happened only once or more than once. She said more than one occasion. I asked her how old was it when it started. She said five or six years old. I asked her when the last sexual conduct was. She said probably 13 years old. I asked if anybody saw what happened to her. She said no. I asked her where these things took place. She actually listed a number of locations where she had been molested. She said her own home, in her bedroom, in her grandparents' house, the upper floor of her great-grandmother's house, and the swimming pool at [defendant's] parents' home.

*Q.* And what else did she tell you?

*A.* She indicated that nothing happened that involved his mouth. She indicated that the person who did this was [defendant], who was her cousin. She indicated that he did molest her with his hands, his fingers.

*Q.* Now, did she tell you anything else?

*A.* She said that he forcibly put a finger inside of her, and then it hurt her. But she didn't describe or remember bleeding related to those episodes. I asked if her [sic] if he did anything with his penis. Her answer was no. I asked her if he used anything else to touch her improperly. Her answer was the handle of a screw driver, an Allen wrench. And by that she meant the same thing. And with a pencil. I asked her if that hurt her. She said yes. I asked her if there was any

bleeding with that, and she said yes. So she indicated that there was an event using a tool that had caused her both pain and bleeding. She didn't indicate that anything involved her anus or her own mouth or her own hands. And she didn't indicate that pornography was used with her.

I also asked her if he said anything to her.

*Q.* Okay.

*A.* And her answer was: He would tell me, this is normal. And you shouldn't be telling people because it's private.

*Q.* And K[G] was also sexually active, correct?

*A.* Yes.

Additionally, Guertin testified that his physical examination revealed that KG had evidence of injury to her hymen in the form of "a deep notch."

Guertin testified that in his opinion, KG:

also gave a strong history of being sexually molested by [defendant]. This included digital penetration and instruments being used to penetrate her vaginal area, which caused pain and bleeding. This included the handle of a screwdriver. [Defendant] would tell her that the activity was normal, but that it needed to be kept private. The physical examination showed deep notch at the 5:00 position of the hymen, which confirms sexual trauma. Again, just as with her sister, and a sexually active person, you can't necessarily say it was from one or the other.

The prosecutor questioned Guertin on direct examination to clarify his opinion regarding whether the alleged victims' injuries were caused by sexual abuse or consensual sexual activity:

*Q.* Now, Doctor Guertin, you've testified and your assessment clearly shows it's difficult to pinpoint and say this is either from sexual abuse or this is from consensual adult sexual contact with these types of injuries, correct?

*A.* Correct.

*Q.* Is there—is one more likely than the other, can you even say that?

*A.* What you can say is you're more likely to suffer an injury if there is penetration across the plane of the hymen during the pre-pubertal period. But you still can get an injury. And especially if there is really frequent intercourse from post-pubertal sex. But just in terms of—in terms of the vulnerability of injury, if the sexual contact in the pre-pubertal period includes penetration across the plane of the hymen, then there is a higher probability from that in the pre-pubertal period to cause injury than in the post-period.

Remember, the post-pubertal period, the opening of the girl's hymen is typically 12 to 25 millimeters. And they have a distensible hymen. So penetration simply is better tolerated there, and less likely to cause injury.

*Q.* All right. Thank you. So, finally, looking back on D[G]'s medical history, and her examination, are there any inconsistencies in her physical exam with the history that she gave you?

*A.* No. No. Both kids actually have evidence of sexual trauma. Both kids indicated not only painful, but bleeding sexual encounters that were molestation, episodes of molestation. And both kids also described being sexually active. So what we found is consistent with either one.

*Q.* With both children, correct?

*A.* Sure.

During cross-examination, Guertin further clarified this point, stating that

you can clearly get these injuries with a painful sexual molestation encounter that entailed bleeding, especially if it was in the pre-pubertal period. You can also get these findings from consensual sex, especially recurrent consensual sex.

Guertin testified that his conclusion that DG and KG had given "clear" and "strong" histories, respectively, of sexual abuse were based only on what they reported and the level of detail; he could not "tell you if they were telling [him] the truth."

On redirect, the prosecutor questioned Guertin as follows:

*Q.* Now. Is it—when you have a history of sexual abuse in this way, you indicated a clear history and a strong history, I think, for each girl, then you find those particular injuries. And in K[G]'s case she specifically says there is no accidental injury. What, if any, conclusion do you draw from that?

*A.* The conclusion that you can—

*Q.* Or diagnosis, I should say.

*A.* There are a number of conclusions you can draw. And they are in the assessment.[11] But the first one is a child gives a history of recurrent forms of sexual molestation. She is describing penetrated molestation on more than one occasion. She is not only is describing discomfort, but describes bleeding associated with at least one of these episodes.

---

[11] Guertin explained that the "[a]ssessment mainly just means my opinion."

-21-

When you examine her, you find that she has two tears in her hymen. Tears in the hymen are completely consistent with what she has said about episodes of penetrative abuse. By the way, they are also consistent with a history of recurrent volitional sexual intercourse.

The second child gives you a history of penetrative events, gives you a history of bleeding as well as pain. She has a single tear on her hymen. That tear in her hymen is completely consistent with what she has said.

She also admits to volitional sexual intercourse. So it could be from that, too.

But in terms of making a diagnosis of sexual abuse, if you have a clear or detailed history, I cannot tell you that it is the truth. I'm telling you that it is clear or strong or detailed. And you have physical findings that would be consistent with what is in that history. *I believe it is valid to conclude that the child was sexually molested. In this case both of them.*

*Q*. Again, that's based on your—it's consistent—with the history is consistent with their findings?

*A*. Right. The diagnostic process is history. Sometimes that's all you have—

*Q*. Sure.

*A*. —physical exam and any laboratory studies that you might do. And in this particular case the diagnostic process would lead you to a conclusion, that led me to a conclusion, frankly, that they have been molested.

*Q*. All right. And you weren't there, you can't know that for sure. You're just basing this on a procedure, correct?

*A*. Right. I can't know that for sure. (emphasis added).

On recross-examination, defense counsel questioned Guertin further on this point as follows:

*Q*. Part of the reason you don't know it for sure is because you don't know whether what they told you was true?

*A*. You can never know if it's the absolute truth, it's only partly true. So, yes, that's the reason why you don't absolutely know.

*Q*. So part of your conclusion is based on an assumption that what they're telling you is accurate, then that would be sexual molestation?

*A*. Right. When we talk to a patient we ask for history. We try to find out about symptoms and signs. *We take them at their word.* (Emphasis added).

-22-

Finally, Guertin also testified about memory-related issues for victims of child sexual abuse. Guertin testified during his direct examination that if something happened to a person repeatedly over a prolonged period of time, it was difficult to remember the specifics about a particular incident. Subsequently, in response to a question from the jury regarding whether it was possible for memories to "blur together or get mixed up" when molestation happens over time, Guertin testified that:

the actual experiences are remembered, but not the details of each individual event. I'm going to give you an example. Let's say on one event I get fondled in the pond, or I have to give somebody a hand job in the pond. Other things might have happened that day, but I remember that. Okay? Let's say six times somebody put a finger up my vagina. I can't remember on what day they did that and something else, necessarily. But I clearly remember having a finger put up my vagina. I don't know necessarily that it happened 10 times or five. But I clearly know that I got a finger put up my vagina over this period of time.

So it's the same with what kids remember if many things have happened many times is broadly what happened to them. If you were beaten as a child, you can clearly remember being beaten and remember how horrible it was. But you can't necessarily remember which day or which beating was that horrible or which beating is this is [sic], what ended up happening to you or that you remember being beaten. It's the same way with this.

So over time, let's say many things happened to a person many times. They remember what those physical things are that happened to them. They may not be able to remember how many of those things happened on any given day, how many of those things were just isolated events.

That's the answer to that question.

*The Court*: And Part 2 of [juror] number 8's question is: Given your response, is this blurring likely or common among victims?

[*Guertin*]: It's common among victims who have repeatedly had things done to them, and/or more than one thing done to them. They remember what the physical acts are that occurred that happened to them. Some they may not tell you about because they are ashamed of them. So kids commonly are ashamed to tell you about being sodomized, and they think nothing about telling you about vaginal penetration. Just all depends on the kid.

Even though there is blurring about each date, each of the event's cycle, if you will, there is not blurring overall about the things that happened to them. Now what they choose to tell you or not, that's up to the kid.

On recross-examination, defense counsel questioned Guertin as follows:

*Q.* Just one more question with regard to a jury question. Other than the information that D[G] supplied you with regard to a lot of rough fingering, the

other acts of being—claims of being penetrated with a penis, having been subjected to having to perform a hand job, and the incident where a tool was used, those were only one incident per each of those categories that she described?

*A.* Right. *She remembers those incidents.*

*Q.* There is no claim that there are repeated instances of those that would blur the details?

*A.* There is the claim by the child that forms of molestation began at age five or six, and ended at age 15 or 16. I think that provides a significant opportunity to blur the details. But it may not.

*Q.* Right. But with regard to the specific acts that I described, the penetration with a penis, the allegation about a hand job, the allegation about a tool, there was only one incident that was claimed by that child of each of those?

*A.* Right. *What she is describing, there are events that she clearly remembers.* (Emphasis added).

Defense counsel did not move to strike any of these answers given by Guertin, despite the fact that neither was responsive to defense counsel's questions.

As an initial matter in analyzing defense counsel's performance with respect to Guertin's testimony, his testimony regarding the alleged victims' statements was inadmissible hearsay. "Hearsay evidence is not admissible at trial unless within an established exception." *People v Meeboer*, 439 Mich 310, 322; 484 NW2d 621 (1992), reh den sub nom *People v Conn*, 439 Mich 1242 (1992); see also MRE 802. Under the hearsay exception in MRE 803(4), "[s]tatements made for the purpose of medical treatment are admissible . . . if they were reasonably necessary for diagnosis and treatment and if the declarant had a self-interested motivation to be truthful in order to receive proper medical care." *People v Mahone*, 294 Mich App 208, 214-215; 816 NW2d 436 (2011), lv den 491 Mich 908 (2012). However, in *Shaw*, Judge Shapiro, writing for the majority, concluded that MRE 803(4) is not applicable when the examination "did not occur until seven years after the last alleged instance of abuse, thereby minimizing the likelihood that the complainant required treatment"; the complainant did not seek out the examining doctor but was instead referred by the police "in conjunction with the police investigation into the allegations of abuse by defendant"; and the complainant had seen a different physician, who did not testify at trial, for gynecological care during the seven year interval. 315 Mich App at 675. A situation with such a long period of time between the alleged sexual assault and the examination differs markedly from a situation where an examination is conducted within a relatively short time after the alleged sexual assault occurred. See, e.g., *People v Garland*, 286 Mich App 1, 9; 777 NW2d 732 (2009) (concluding that the "victim's statements to the nurse were reasonably necessary for her treatment and diagnosis" where the victim went to the hospital for medical care and was examined on the same day as the sexual assault).

In this case, there was also a period of approximately five years or more between the last alleged incident of sexual abuse and Guertin's examinations of DG and KG. Moreover, Harrison testified that she referred DG and KG to Guertin after their forensic interviews, and DG testified

that she had previously seen gynecologists and had disclosed the sexual abuse to someone at Planned Parenthood at some point before her examination with Guertin occurred. Although Guertin testified that he examined DG and KG for purposes of medical treatment that does not mean that the examinations were actually for medical treatment for purposes of MRE 803(4); an expert witness cannot testify to a legal conclusion. *People v Drossart*, 99 Mich App 66, 75; 297 NW2d 863 (1980) ("[I]t is important that the expert witness not be permitted to testify about the requirements of law which apply to the particular facts in the case or to phrase his opinion in terms of a legal conclusion."). Guertin's examination was not reasonably necessary for medical treatment but was instead aimed at furthering the investigation. Therefore, Guertin's testimony regarding the alleged victims' statements was inadmissible hearsay because it did not fall within the hearsay exception of MRE 803(4). *Shaw*, 315 Mich App at 675.

Moreover, Guertin also impermissibly vouched for the credibility of DG and KG through his testimony. In stating his expert opinion, Guertin testified that DG "gave a very clear history of being sexually molested over a period of years, beginning at a very early age, age 5, by a person named [defendant]." Guertin then immediately continued by recounting several of DG's specific allegations against defendant. Guertin also testified that in his expert opinion, KG "gave a strong history of being sexually molested by [defendant]" and then immediately continued by recounting specific allegations made by KG against defendant. Furthermore, although Guertin acknowledged that he could not actually tell if DG and KG were telling the truth, he also testified that his conclusion that DG and KG had given "clear" and "strong" histories, respectively, of sexual abuse were based only on what they reported and the level of detail in their accounts. Guertin further opined that when these histories were considered along with his findings of physical injury that was equally consistent with penetrative abuse as well as consensual sexual intercourse, he concluded that it was "valid" to conclude that DG and KG were "sexually molested." Guertin also explained memory-related issues and then affirmatively stated that the incidents described by DG were what she remembered.

By repeating the alleged victims' statements in the context of stating his expert opinion, Guertin went beyond merely recounting their medical history and instead imbued the allegations with the authoritative weight of a final conclusion by an expert. Essentially, Guertin testified that he found the alleged victims' stories credible. When understood in this light, Guertin's other testimony that he could not be certain that DG and KG had told him the truth seems somewhat disingenuous. As our Supreme Court has explained with respect to expert testimony in child sexual abuse cases,

> Given the nature of the offense and the terrible consequences of a miscalculation-the consequences when an individual, on many occasions a family member, is falsely accused of one of society's most heinous offenses, or, conversely, when one who commits such a crime would go unpunished and a possible reoccurrence of the act would go unprevented-appropriate safeguards are necessary. *To a jury recognizing the awesome dilemma of whom to believe, an expert will often represent the only seemingly objective source, offering it a much sought-after hook on which to hang its hat.* [*Peterson*, 450 Mich at 374 (emphasis in original; quotation marks and citation omitted).]

Furthermore, Guertin's opinion that it was valid to conclude that DG and KG had been sexually molested constituted impermissible vouching because that conclusion was not supported by objective medical evidence. Our Supreme Court has stated that even in the sexual assault context, it is "well-established that expert opinion testimony will not be excluded simply because it concerns the ultimate issue." *People v Smith*, 425 Mich 98, 101,106; 387 NW2d 814 (1986), citing MRE 704.[12] However, the examining physician's opinion must be based on objective evidence "within the realm of his medical capabilities or expertise," or else it is merely an improper opinion on the complainant's veracity. *Id*. at 112-115 (holding that a doctor's opinion that a complainant was sexually assaulted should not have been admitted where it was based on the complainant's emotional state and self-reported history rather than on any "findings within the realm of his medical capabilities or expertise as an obstetrician/gynecologist" because this expert opinion had the effect of being an "assessment of the victim's credibility").

In *People v McGillen #2*, 392 Mich 278, 284-285; 220 NW2d 689 (1974), our Supreme Court held that a doctor's opinion that penetration had occurred was improperly admitted where "the prosecutrix admit[ed] that a second rape occurred subsequent to the charged offense, any testimony the doctor may give is irrelevant and immaterial especially in view of the length of time that intervened between the alleged act and the physical examination." That case involved defendant's trial for the first alleged incident of sexual assault, but the doctor had only conducted a physical examination of prosecutrix approximately two weeks after that incident; during that two-week interval, the prosecutrix was sexually assaulted a second time. *Id*. at 281-282. In reaching its holding, our Supreme Court reasoned as follows:

> By accepting as fact the prosecutrix's factual history and then testifying that in his expert opinion the medical examination supported and was consistent with that history, he is lending his medical opinion to support a claim made by the prosecutrix that is beyond the realm of his medical capabilities and expertise. The doctor is not a qualified expert on the question of whether or not the prosecutrix was raped by the defendant on the alleged date. [*Id*. at 285.]

In this case, Guertin testified that his physical examination revealed injuries to the hymens of DG and KG that he opined were equally consistent with being caused by childhood sexual abuse or consensual sexual activity. The medical histories of both DG and KG indicated that each girl was sexually active at the time of the examinations and that each girl alleged instances of childhood sexual abuse. To the extent that Guertin opined that the injuries could have been caused by either the alleged abuse or consensual sexual activity that was part of DG's and KG's medical histories, this opinion was supported by objective medical evidence in the form of his physical findings and medical expertise. Guertin also adequately explained the justification for his conclusion that sexual abuse during the pre-pubertal stage was a "more likely" cause, based on his medical knowledge of female anatomy and development. However, Guertin had no objective medical basis from which to conclude that the "valid" conclusion was

---

[12] MRE 704 provides: "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

that DG and KG had been "sexually molested." By choosing one cause over the other without an objective medical reason, Guertin went beyond the scope of what the his medical expertise actually allowed and ventured improperly into the realm of inadmissible lay opinion about the credibility of the alleged victims allegations against defendant. *Id*. This was also improper vouching. *Musser*, 494 Mich at 349; *Peterson*, 450 Mich at 352; *Buckey*, 424 Mich at 17.

For the same reasons that defense counsel's performance was deficient with respect to his failure to challenge Harrison's vouching testimony, defense counsel's performance was also below an objective standard of reasonableness with respect to his failure to challenge Guertin's vouching testimony. *Douglas*, 496 Mich at 585-586. Like police officers, expert witnesses are prone to having their statements given a greater degree of weight by juries. *Peterson*, 450 Mich at 374.

## V. CONCLUSIONS

Turning next to the prejudice prong under *Strickland*, defendant must show that there is a reasonable probability that but for counsel's deficient performance, the outcome of the trial would have been different. 466 US at 694. A reasonable probability is one that is "sufficient to undermine confidence in the outcome," and this standard does not require defendant to show that the outcome was "more likely than not" altered. *Id*. at 693, 694. "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id*. at 694.

The instant case admittedly presents a closer question of prejudice than *Douglas* or *Shaw*. In both of those cases, there were no third-party witnesses to the alleged abuse and little or no physical evidence. *Douglas*, 496 Mich at 567; *Shaw*, 315 Mich App at 677. In this case, there were no eyewitnesses to any of the incidents involving penetration of DG or KG, but there was testimony that defendant had been seen on multiple occasions grabbing and poking DG and KG. Her mother also witnessed the incident where defendant grabbed DG's chest on the couch.

However, even in the context of CSC-II, which is based on "sexual contact," the prosecution must still prove that the intentional touching could "reasonably be construed as being for the purpose of sexual arousal or gratification, done for a sexual purpose, or in a sexual manner for" revenge, inflicting humiliation, or out of anger. MCL 750.520a(q); MCL 750.520c(1). The jurors in this case clearly did not believe all of the allegations that were made: they acquitted defendant of one charge and could reach a unanimous verdict on another charge. Considering the heightened weight that juries tend to give police officers and expert witnesses, *Peterson*, 450 Mich at 374; *Musser*, 494 Mich at 363, and the amount of vouching and hearsay evidenced admitted without objection, it is reasonably likely that that the improper vouching by Harrison and Guertin could have convinced the jury that at least some of the allegations were credible and, with respect to the CSC-II conviction, that defendant touched DG for a sexual purpose as opposed to some other purpose.

Such a conclusion is not mere conjecture. See *Strickland*, 466 US at 693 ("It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding."). Both Harrison and Guertin were the very witnesses our Supreme Court

-27-

alluded to in *Peterson* when they held: "To a jury recognizing the awesome dilemma of whom to believe, an expert will often represent the only seemingly objective source, offering it a much sought-after hook on which to hang its hat." *Peterson*, 450 Mich at 374. While it is important not to minimize the significance of improperly touching another person in a sexual manner, it is also worth noting that the instant case also involved a substantial amount of "other-acts" evidence related to incidents that defendant would have allegedly committed when he was a minor as young as 12 years old. These other acts were put into evidence in order to convince the jury to convict defendant of criminal offenses that he allegedly committed as an adult. Presuming that there was no error in admitting all of this other-acts evidence,[13] it would still be reasonable for jurors to potentially ascribe a different amount of weight or different purposes to the acts of a 12 year old then they might to the acts of an adult, unless there was evidence suggesting that they should do otherwise. Accordingly, the wrongful admission of vouching testimony given by a police detective and a medical expert, who opined that DG and KG had been "sexually molested," could have reasonably made a difference in how the jury perceived the alleged victims' claims and the intent of any acts they believed defendant committed. See *Peterson*, 450 Mich at 374; *Musser*, 494 Mich at 363; see also *Douglas*, 496 Mich at 580 (noting that "[w]hile credibility contests are not uncommon in criminal sexual conduct cases, the wrongful admission of corroborating testimony on either side could tip the scales and result in harmful error") (quotation marks and citation omitted).

Contrary to my brethren in the majority, I question their reliance on *People v Dobek*, 274 Mich App 58, 71; 732 NW2d 546 (2007), lv den 480 Mich 897 (2007), for the proposition that a jury certainly understands that a detective testifying as a prosecution witness in a criminal trial believes that an alleged victim is telling the truth, regardless of any impermissible vouching testimony that may be introduced. In my opinion, this reliance is misplaced because *Dobek* involved an unpreserved claim of prosecutorial misconduct premised on eliciting the vouching testimony rather than a claim of ineffective assistance of counsel based on a failure to object to the vouching testimony. *Id*. at 70-71. The *Dobek* Court concluded that "[a]ssuming plain error, defendant has not established prejudice, actual innocence, or damage to the integrity of the judicial proceedings." *Id*. at 71. When a prosecutorial misconduct claim involves an evidentiary issue, the focus is on "whether the prosecutor elicited the testimony in good faith." *Id*. at 70-71. In contrast, the focus in the ineffective assistance of counsel context is on "whether [defense] counsel's failure to object to the improper evidence was constitutionally deficient, and if so whether that failure prejudiced the defendant." *People v Randolph*, ___ Mich ___, ___; ___ NW2d ___ (2018). Clearly, these are two very different questions. The first involves examining

---

[13] See, e.g., *In re Kerr*, ___ Mich App ___, ___; ___ NW2d ___ (2018) (Docket No. 335000); slip op at 2-4 (holding that MCL 768.27a, which permits the prosecution in a criminal case involving a listed offense against a minor to introduce evidence that the defendant committed another listed offense against a minor, also applies in juvenile-delinquency trials but is still subject to the specific application of MRE 403 set forth in *People v Watkins*, 491 Mich 450; 818 NW2d 296 (2012)). "Listed offense" means "that term as defined in section 2 of the sex offenders registration act . . . ." MCL 768.27a(2)(a).

the prosecutor's actions and the second involves looking at defense counsel's actions; whether a prosecutor acts in good faith while eliciting evidence does not answer the question whether a defense attorney's failure to object to such evidence is below an objective standard of reasonableness. In *Randolph*, our Supreme Court explained this point in the context of distinguishing between the analysis applicable to unpreserved claims that the trial court erred and claims of ineffective assistance of counsel:

> As an initial matter, the specific error that is the focus of each standard is different. It is the trial court's unobjected-to error that is the subject of plain-error review. By contrast, the "ultimate determination" of an ineffective-assistance claim "is not the propriety of the trial court's actions with regard to an alleged error, but whether defendant has suffered a genuine deprivation of his right to effective assistance of counsel . . . ." There will no doubt be occasions when both standards are relevant; trial counsel's deficient performance will often result in a trial court error, but the claims associated with each type of error have their own elements and require different analyses. In evaluating a trial court's error the appellate court is making one determination, and in evaluating trial counsel's deficient performance, the determination is different.
>
> The tests for each determination reflect their differences. The first two prongs of the plain-error standard require that an error exist and that it be obvious. Neither of these alone satisfies either *Strickland* prong. A trial court's error does not tell us (1) whether counsel performed deficiently with respect to that trial court error or (2), if counsel's performance was deficient, whether it prejudiced the defendant. The obviousness of the error, the second plain-error test element, is no different. While in some instances an obvious error may correlate with counsel's ineffectiveness in responding to it and the prejudice resulting from that failure, in others instances it will not. [*Id*. at ___; slip op at 7-8 (citations omitted; ellipsis in original).]

Furthermore, with respect to the prejudice requirement under both the plain error standard and the ineffective assistance of counsel standard, the *Randolph* Court stated that "a finding that a defendant failed to satisfy the prejudice prong when complaining about an error by the court will not necessarily mean that the defendant is unable to prevail on an ineffective-assistance claim relating to the same underlying issue." *Id*. at ___; slip op at 10. Accordingly, *Dobek* does not compel the conclusion that defense counsel in the instant case was not ineffective with respect to Harrison's vouching testimony. A prosecutor could elicit improper testimony while acting in good faith (and thus without having committed misconduct), but it still might be constitutionally ineffective for defense counsel to have failed to object to that improper testimony.

Rather than relying on *Dobek*, I find the decisions in *Douglas* and *Shaw* applicable. The instant case involved a situation where the credibility of the alleged victims was of central importance, and seemingly objective witnesses with the authoritative positions of police detective and medical doctor testified in a manner that vouched for the believability of the alleged victims' stories. For the above reasons, there is a reasonable probability that if defense counsel had objected to this vouching testimony and prevented it from being admitted, the outcome of defendant's trial would have been different and the jury would not have convicted

him as it did. The failure by trial counsel to object to the hearsay statements provided by Harrison and Guertin allowed those statements to be considered by the jury. The failure of trial counsel to allow them to present their testimony, again without objection, in a manner best described as human lie detectors, undermined the credibility of the verdict and denied defendant a fair trial. See *Peterson*, 450 Mich at 374; *Douglas*, 496 Mich at 586-588; *Shaw*, 315 Mich App at 677-678. Accordingly, I would reverse the convictions of defendant and remand the matter to the trial court for a new trial.

/s/ Stephen L. Borrello